UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COREY GAMBLE,

               Petitioner,

      - against -

BRIAN FISCHER, COMMISSIONER OF
THE STATE OF NEW YORK
DEPARTMENT OF CORRECTIONS AND
COMMUNITY SUPERVISION

               Respondent.

**ORDER**

13 Civ. 1048 (PGG) (JW)

PAUL G. GARDEPHE, U.S.D.J.:

       Pro se Petitioner Corey Gamble filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. 2254, challenging his October 2004 conviction in New York State court for first-degree murder and second-degree murder.  (Dkt. No. 2)  This Court referred the petition to Magistrate Judge Kevin Nathaniel Fox for a Report and Recommendation ("R&R").  (Dkt. No. 8)  On June 6, 2014, Judge Fox issued an R&R recommending that the petition be denied. (Dkt. No. 33)  Petitioner filed objections to the R&R on July 10, 2014.  (Dkt. No. 36)  After issuance of the R&R, Petitioner also moved to amend his petition and for appointment of counsel.  (Dkt. No. 73)

       For the reasons set forth below, Petitioner's objections will be overruled and the R&R will be adopted in its entirety.  Petitioner's motions to amend the petition and for appointment of counsel will be referred to Magistrate Judge Jennifer Willis for a second R&R.

## BACKGROUND

On October 8, 2004, Gamble was convicted of first-degree murder and second-degree murder in Supreme Court of the State of New York, Bronx County.  He was sentenced to life imprisonment without the possibility of parole.  (Pet. (Dkt. No. 2) at 1)[1]

## I.    FACTUAL BACKGROUND[2]

Gamble was convicted of murdering Eunice Younger, Gloria Watson, and Ricky Younger on March 15, 2003.  The evidence at Gamble's trial in September and October of 2004 showed the following:

Eunice Younger, who was 74 years old at the time of her death, lived at 1995 Birchall Avenue in the Bronx with her two adult children, Gloria Watson and Ricky Younger.  (Trial Tr. at 110-12, 128)[3]  The building at 1995 Birchall Avenue contained four apartments: two on the top floor, and two on the bottom floor.  (Id. at 112-13)  Eunice Younger and her family (together, the "Youngers") lived in the top floor apartment on the right side, when facing the building.  (Id. at 114)  Monica Killebrew lived in the top floor apartment on the left side of the building, opposite the Youngers.  (Id. at 114, 465)  Gamble lived in the apartment on the bottom floor, directly below the Youngers.  (Id. at 114)

---

[1]  The page numbers of documents referenced in this Order – other than the trial transcript – correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.  Citations to the trial transcript correspond to the transcript page numbers, rather than to the page numbers designated by this District's ECF system.

[2]  Petitioner objects to the factual "background" section of the R&R because "all trial testimony presented by or beneficial to the prosecution is described as something that happened," while "Petitioner's actions described by him on the witness stand are preceded by 'Gamble testified' or 'Gamble claimed.'"  (Pet. Obj. (Dkt. No. 36) at 14)  Petitioner's objection is overruled.  The magistrate judge's references to Gamble merely make clear that it is his testimony that is being recounted.

[3]  The full trial transcript is available at Dkt. Nos. 78-86.

A.    **The April 13, 2002 Dispute**

Gamble was involved in at least two disputes with the Youngers prior to March 15, 2003.

Cortina Watson, the daughter of Gloria Watson, testified that on April 13, 2002, she was visiting the Youngers' apartment when Gamble started kicking on the apartment door. (Id. at 119-121) When she opened the door, Gamble said to her and Ricky Younger, "I told you MF'ers when I'm taking my shower not to mess with the hot water." (Id. at 121) An argument ensued, and Cortina Watson testified that Gamble told her and Ricky Younger, "If I catch you outside or you outside I'm going to kill you." (Id. at 123) Cortina Watson pushed Gamble out of the doorway, and Ricky Younger called the police. (Id.) Cortina Watson went to the window of the apartment, where she watched Gamble leave the building and cross the street. (Id. at 125) Gamble said, "yeah, bitch, come downstairs and I have something for you too." He then lifted his shirt, exposing the handle of a gun. (Id. at 125-26)

Gamble admitted at trial that he had a dispute with the Youngers on April 13, 2002. He testified that he "notice[d] he had a flat" on his car and "suspected that [Ricky Younger] was the one who flattened [his] tire." (Id. at 1265) Gamble denied that he possessed a gun on April 13, 2002 and testified that he did not "own a gun" and "never has." (Id. at 1267)

Gamble was arrested by officers of the New York City Police Department (the "NYPD"), and Cortina Watson and Ricky Younger obtained an order of protection against him. (Id. at 126-27, 152)

**B.**    **The January 18, 2003 Dispute**

Marvin Ford – Gloria Watson's fiancé (id. at 345) – testified about a second incident involving Gamble that took place on January 18, 2003.

"[A] little after midnight" that day, Ford was inside the Youngers' apartment with Gloria Watson, Eunice Younger, and Ricky Younger. They were all awake. (Id. 350-53) Ford heard something "scratching and pounding" at the door, and Ricky opened the door to find Petitioner. (Id. at 353, 356) Ford testified that Gamble said, "I am tired [of] you guys making noise [and] running across the floor." He then "displayed a knife" and said, "you making all this noise I should stab you." (Id. at 356-57, 359) Ricky Younger closed the door, locked it, and called the police. (Id. at 359) While waiting for the police to arrive, Ford looked out the window of the apartment and saw Gamble outside, putting items into his car. (Id. at 361) Ford testified that Gamble said, "oh, I got something for you here." (Id. at 363) He then pulled up his shirt and took out a revolver. (Id.) By the time police arrived, Gamble was back inside the apartment building. (Id. at 365)

At trial, Gamble admitted that he had had a dispute with the Youngers on January 18, 2003. Petitioner said that he encountered Marvin Ford and Ricky Younger outside the apartment building near his car. An argument ensued when Gamble accused them of giving his car a flat tire. (Id. at 1269-70)

Ford and Ricky Younger obtained orders of protection against Gamble as a result of this incident. (Id. at 365-66)

**C.**    **The March 15, 2003 Murders**

On March 15, 2003, Marvin Ford was staying at the Youngers' apartment with Eunice Younger, Ricky Younger, and Gloria Watson. (Id. at 369)

Ford left the Youngers' apartment at about 1:00 p.m.  On his way out of the apartment building, Ford passed by the door to Gamble's apartment.  (Id. 392-93)  As Ford was walking by, Gamble "rush[ed] out the door" of his apartment, kicked Ford in the ankle, and ran out of the building.  (Id. at 393-94)  Ford testified that he had "had enough."  He returned to the Youngers' apartment, grabbed a baseball bat, and left the building in search of Gamble.  (Id.)  As Gamble was crossing the street next to the apartment building, Ford hit him in the back with the baseball bat, and Gamble "tumbled over."  (Id. at 394)  Ford testified that Gamble got up, started to approach him, and said, "I'm going to come back.  I'm going to shoot you all."  (Id. at 395)  Gamble then ran away.  Ford left the apartment building at about 1:30 p.m.  (Id. at 395, 398)

At trial, Gamble denied that Ford had assaulted him with a baseball bat that afternoon.  Gamble testified that he was at The Home Depot and later at his mother's home in the Bronx when the assault allegedly took place.  (Id. at 1273-74)

At about 4:00 p.m., Monica Killebrew – the Youngers' upstairs neighbor – was in her apartment when she heard "a banging so loud on the door [she] thought it was her door." (Id. at 485)  Killebrew went to her bedroom to put on clothes, returned to the door of her apartment, and heard what "sounded like people . . . getting thrown up against the wall.  It sounded like a fight."  (Id. at 486-87)  It sounded "threatening and antagonistic," like a "massacre."  (Id. at 538-39)  Killebrew did not have a phone, so she ran to the window of her apartment, opened it, and "yelled out the window for someone to please call the police," because "it sounds like [her] neighbors are getting their asses kicked."  (Id. at 487-88)  When Killebrew

returned to the door of her apartment, she heard Gamble say, "I am tired of you people bothering me," followed by a "popping sound" that sounded like a "gunshot." (Id. at 488-89)[4]

Killebrew "ran to the window" of her apartment, but before she got there, she heard Eunice Younger scream, "help me, help me." Killebrew then heard "three more shots." (Id. at 489) Killebrew "stuck [her] head back out the window" and was "begging anybody to . . . call the police." (Id. at 489-90) Killebrew then heard a "big slam behind" her, which sounded like it came "from across the hall." (Id. at 490) About fifteen seconds after hearing the "big slam," Killebrew looked out the window and saw Gamble leave the building, cross the street, and walk out of view. (Id. at 490-92) Killebrew did not see anyone else enter or leave the building. (Id. at 568-69)

The day after the shootings, Killebrew identified Gamble in a police lineup. (Id. at 496-99)

Two other witnesses testified at trial that they heard gunshots at about 4:00 p.m. on March 15, 2003, and then observed Gamble leave the apartment building.

Jose Calderon owned a tire shop "right next" to the apartment building. (Id. at 58-59) At about 4:00 p.m., Calderon was in the tire shop when he heard "people screaming outside, 'Call 911.'" (Id. at 63) Calderon "went outside, came back in, [and] called 911." He then "heard the shot fired." (Id.) Calderon "went back outside" and "saw a lady . . . screaming out the window." The screaming woman was "one of [Calderon's] neighbors." (Id.) "[S]hortly after" Calderon saw the woman screaming at the window, he saw Gamble "come out of the

---

[4] Killebrew testified that she was "one hundred percent sure" she heard Gamble's voice. (Id. at 489) A week before the murders, Killebrew was close to Gamble for about fifteen minutes. During that time, Gamble was "hollering, screaming, [and] yelling." (Id. at 482-84) Gamble denies that he ever raised his voice while Killebrew was nearby. (Id. at 1421-22)

building." (Id.) Prior to March 15, 2003, Calderon had seen Gamble – a customer of Calderon's tire shop – "two or three times a week." (Id. at 65) Calderon did not see anyone else leave the apartment building. (Id. at 67)

At trial, Gamble admitted that he "knew" Calderon and that he had been to the tire store at least once as a customer. (Id. at 1381-82, 1392)

Nelson Rivera testified that on March 15, 2003, he took his car to Calderon's tire shop. (Id. at 790-91) At about 4:00 p.m., Rivera was standing beside his car outside the tire shop when he saw a woman appear in the window on the left side of the apartment building. The woman said, "Help. They are going to – he's going to kill them," and "call the police." (Id. at 794-97) Rivera then saw another woman open the window on the right side of the apartment building. (Id. at 799-802) After opening the window, the second woman said, "Help us. He is going to kill us." (Id.) Rivera then saw "a dark hand pull her back, close the window, and then [he] heard one, what sounded like a gunshot, and then it was a brief pause then [he]heard three other gunshots." (Id. at 802) A few second after hearing the gun shots, Rivera "heard the door slam" and saw Gamble leave the apartment building, cross the street, and walk away. (Id. at 805-06) Rivera did not see anyone else leave the building. (Id. at 812) The next day, Rivera identified Gamble in a police lineup. (Id. at 812-814)

### D.    The Police Investigation

Police officers arrived at the Youngers' apartment about five to ten minutes after the shootings. (Id. at 573) Officers "kicked open the door" to the apartment and found the bodies of Eunice Younger, Ricky Younger, and Gloria Watson inside. (Id. at 494-95) Detective Horace Wright – assigned to the NYPD's Crime Scene Unit – arrived at the murder scene at about 6:05 p.m. He testified that the three victims had each suffered gunshot wounds to the

head.  (Id. at 195, 200)  Det. Wright did not find any shell casings in the apartment, indicating

that the killer had used a revolver.  (Id. at 240-41)

Det. Wright lifted a latent fingerprint from a window frame in the apartment.

The fingerprint was found on the handle used to open and close the window.  (Id. 262-63)

Detective Frank Gallipani compared this fingerprint with examples of Petitioner's fingerprints.

He testified that he was "one hundred percent certain" that the fingerprint found on the window

handle matched Gamble's left ring finger.  (Id. at 892-93, 896)  Det. Galliano's fingerprint

analysis was confirmed by a second fingerprint examiner employed by the Connecticut State

Police.  (Id. at 895)

Gamble testified that he has "never been inside" the Youngers' apartment and

that the print did not belong to him.  (Id. at 1269)

**E.**    **The Defense Case and the People's Rebuttal**

Gamble testified that, on the day of the murders, he left his apartment at about

10:30 a.m. to go to Radio Shack.  (Id. at 1273)  At about 11:45 a.m., he left Radio Shack to go to

The Home Depot to apply for a job.  (Id.)  After leaving The Home Depot, he went to his

mother's house at 805 Taylor Avenue in the Bronx, where he stayed until 5:30 or 5:45 p.m.  (Id.

at 1274)

While at his mother's house, at 5:00 or 5:30 p.m., Gamble saw a news report on

the television about the murders.  News 12 reported that the police were looking for "Corey

Gamble" in connection with the shootings.  (Id. at 1274-75)  After watching the broadcast,

Gamble drove to his attorney's office at 165th Street and the Grand Concourse in the Bronx.

(Id.)  Gamble's attorney was not at the office, and Gamble then sat in his car for the next "five or

six" hours.  He then took a cab to the NYPD's 49th Precinct station house.  (Id. at 1276-77)  He

arrived at the 49th Precinct at about "one or two in the morning" and surrendered at that time. (Id. at 1278)

In rebuttal, the People called Camilo Pombo, who was the general manager and news director for News 12.  (Id. at 1515)  Pombo testified that on March 15, 2003, the evening newscast at 5:00 p.m. and 5:30 p.m. was a rerun of the 1:00 p.m. newscast.  (Id. at 1518-21)  The first story about the murders did not appear on News 12 until the 10:00 p.m. newscast.  (Id. at 1521)

### F.    The Jury's Verdict and Gamble's Appeal

On October 8, 2004, the jury found Gamble guilty of first-degree murder and second-degree murder.  (Id. at 1767)  On November 19, 2004, Gamble was sentenced to life imprisonment without the possibility of parole.  (Pet. (Dkt. No. 2) at 1)

Petitioner filed an appeal with the First Department of the New York Supreme Court, Appellate Division.  On April 22, 2010, the First Department issued a decision affirming Gamble's conviction.  People v. Gamble, 72 A.D.3d 544, 546 (1st Dept. 2010).  The New York Court of Appeals affirmed Petitioner's conviction on February 9, 2012.  People v. Gamble, 18 N.Y.3d 386, 399 (2012).

## II.    PROCEDURAL HISTORY

On February 13, 2013, Gamble filed the instant petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254.  (Dkt. No. 2)  The petition raises four arguments:  (1) denial of the "equal opportunity to be heard," because the New York Court of Appeals did not hear oral argument from Petitioner, who appeared pro se; (2) ineffective assistance of counsel premised on trial counsel's failure to (a) object to a jury instruction related to prior bad act evidence, and (b) pursue exculpatory material related to the baseball bat attack that occurred on

the day of the murders; (3) the fact that the appellate record for Petitioner's appeal to the First Department and the New York Court of Appeals did not contain the exculpatory material related to the baseball bat attack; and (4) improper admission of evidence under the business records exception to the hearsay rule.  (Id. at 5-10)

On April 4, 2013, this Court referred the petition to Judge Fox for an R&R. (Dkt. No. 8)  On June 6, 2014, Judge Fox issued an R&R recommending that the petition be denied.  (Dkt. No. 33)  Petitioner filed objections to the R&R on July 10, 2014.  (Dkt. No. 36)

In a May 26, 2020 letter, Petitioner informed this Court that he was pursuing an appeal to the New York Supreme Court, Appellate Division, First Department.  (Dkt. No. 42) Petitioner asked that his habeas petition "be held in abeyance to allow the State an opportunity to answer [his] legal issues."  (Id.)  In a June 10, 2020 order, this Court stayed this case "pending resolution of Petitioner's state appeal."  (Dkt. No. 43)

While this matter was stayed, Petitioner filed a number of motions seeking to amend his habeas petition (Dkt. Nos. 61, 63, 64, 67, 68, 71, 73, 74), and for appointment of counsel.  (Dkt. Nos. 64, 67, 68, 71, 73, 74)

In a June 27, 2024 order, this Court found that "Petitioner's post-conviction proceedings and appeals in New York State court have concluded," and lifted the stay.  (Dkt. No. 77) at 2)

## DISCUSSION

## I.    LEGAL STANDARD

### A.    Review of a Magistrate Judge's Report and Recommendation

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).  Where, as here, a timely objection has been made

10

to a magistrate judge's recommendation, the district court judge "shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made." <u>Id.</u>  However, "[o]bjections that are 'merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke <u>de novo</u> review.'" <u>Phillips v. Reed Grp., Ltd.</u>, 955 F. Supp. 2d 201, 211 (S.D.N.Y. 2013) (quoting <u>Vega v. Artuz</u>, 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002)) (alteration in <u>Phillips</u>).  "To the extent . . . that the party . . . simply reiterates the original arguments, [the district court] will review the Report strictly for clear error." <u>Indymac Bank, F.S.B. v. Nat'l Settlement Agency, Inc.</u>, 07 Civ. 6865 (LTS), 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008) (citing <u>Pearson-Fraser v. Bell Atl.</u>, No. 01 Civ. 2343(WK), 2003 WL 43367, at *1 (S.D.N.Y. Jan. 6, 2003); <u>Camardo v. Gen. Motors Hourly-Rate Employees Pension Plan</u>, 806 F.Supp. 380, 382 (W.D.N.Y.1992)); <u>see also</u> <u>Ortiz v. Barkley</u>, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008) ("Reviewing courts should review a report and recommendation for clear error where objections are 'merely perfunctory responses,' . . . 'rehashing . . . the same arguments set forth in the original petition.'") (citing <u>Vega</u>, 2002 WL 31174466, at *1; <u>Greene v. WCI Holdings</u>, 956 F.Supp. 509, 513 (S.D.N.Y. 1997)).

For portions of the R&R to which no objection is made, this Court's review is limited to a consideration of whether there is any "'clear error on the face of the record'" that precludes acceptance of the recommendations.  <u>Wingate v. Bloomberg, 2011 WL 5106009</u>, at *1 (S.D.N.Y. Oct. 27, 2011) (quoting Fed. R. Civ. P. 72(b) advisory committee note; citing <u>Nelson v. Smith</u>, 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985) ("To accept the report and recommendation of a magistrate, to which no timely objection has been made, a district court need only satisfy itself that there is no clear error on the face of the record.")).

11

**B.**    <u>28 U.S.C. § 2254</u>

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

Penalty Act of 1996 (the "AEDPA"), courts may only grant a habeas petition if a challenged

state court decision is (1) "contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United States" at the time of

the state court decision, or (2) "was based on an unreasonable determination of the facts in light

of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

Under the first prong, the "Supreme Court has instructed that section 2254(d)(1)'s

'contrary to' and 'unreasonable application of' clauses have independent meaning."  <u>Carmichael</u>

<u>v. Chappius</u>, 848 F.3d 536, 544 (2d Cir. 2017) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 404-05

(2000)).  "A state court decision is 'contrary to . . . clearly established Federal law, as determined

by the Supreme Court' when 'the state court arrives at a conclusion opposite to that reached by

[the Supreme Court] on a question of law or if the state court decides a case differently than [the

Supreme Court] has on a set of materially indistinguishable facts.'"  <u>Id.</u> at 544 (quoting

<u>Williams</u>, 529 U.S. at 412–13); <u>see also</u> <u>Parker v. Matthews</u>, 567 U.S. 37, 48-49 (2012) (circuit

precedent, even if "merely reflect[ing]" Supreme Court precedent, does not constitute "clearly

established federal law").  "Clearly established Federal law for purposes of § 2254(d)(1) includes

only the holdings, as opposed to the <u>dicta</u>, of [Supreme Court] decisions."  <u>White v. Woodall</u>,

572 U.S. 415, 419 (2014) (quotation marks and citations omitted).

A state court's application of federal law is unreasonable where it "correctly

identifies the governing legal rule but applies that rule unreasonably to the facts of a particular

prisoner's case."  <u>Id.</u> at 426.  Such application of federal law must be "'objectively

unreasonable,' not merely wrong; even 'clear error' will not suffice."  <u>Id.</u> at 419 (quoting

<u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-76 (2003)).  "The state court decision must be 'so lacking

12

in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Woods v. Etherton, 578 U.S. 113, 117 (2016) (quoting White, 572 U.S. at 420). The standard "is 'difficult to meet.'" Metrish v. Lancaster, 569 U.S. 351, 357-58 (2013) (quoting Harrington v. Richter, 562 U.S. 86, 102 (2011)).

Under the second prong, a state court's factual determinations "may not [be] characterize[d] . . . as unreasonable 'merely because [a reviewing court] would have reached a different conclusion in the first instance.'" Brumfield v. Cain, 576 U.S. 305, 313-14 (2015) (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)). Section 2254(d)(2) instead requires a reviewing court to "accord the state trial court substantial deference. If '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" Id. (quoting Wood, 558 U.S. at 301)

## II.    PETITIONER'S OBJECTIONS TO THE R&R

Judge Fox rejects each of Petitioner's four grounds for habeas relief. (R&R (Dkt. No. 33)) Petitioner objects to Judge Fox's findings as to each ground for habeas relief. (Pet. Obj. (Dkt. No. 36)) For the reasons stated below, Petitioner's objections will be overruled.

### A.    Denial of Oral Argument

Gamble contends that he is entitled to habeas relief because, during his direct appeal, the New York Court of Appeals denied him the opportunity – as a pro se litigant – to offer oral argument. (Pet. (Dkt. No. 2) at 5; Pet. Br. (Dkt. No. 2-1) at 1-2) Gamble contends that the New York Court of Appeals' action is contrary to, or involves an unreasonable application of, the Supreme Court's holding in Price v. Johnston, 334 U.S. 266 (1948). (Pet. Reply Br. (Dkt. No. 28) at 3-7)

Judge Fox rejects Gamble's argument, finding that Price is not on point:

13

Price is not clearly established Supreme Court precedent governing Gamble's denial of equal opportunity to be heard before the Court of Appeals claim. Price involved a denial of the petitioner's request to appear for oral argument before the court en banc in a federal habeas corpus proceeding, not a denial of the request to appear for oral argument on appeal to the highest court of the state from the judgment of conviction, as is the case here. [Price, 334 U.S. at 276-77, 68 S.Ct. at 1055-56.] The issue in Price was whether a circuit court of appeals has the power to order that a prisoner be brought before it to argue his own appeal. [Id. at 278, 68 S.Ct. at 1056-57.] Thus, Price established clearly that a circuit court has the power to do so, and the exercise of that power is discretionary. [Id. at 284-86, 68 S.Ct. at 1059-60.]

Although Gamble does not make citation to any particular constitutional provision he contends was violated by the Court of Appeals' denial of his "equal opportunity to be heard" claim, he quotes the following language from Price in support of his argument that he was entitled to such an opportunity: "[W]here oral argument is slated to take place, fairness and orderly appellate procedure demand that both parties be accorded an equal opportunity to participate in the argument either through counsel or in person." Id. at 280, 68 S. Ct. 1057. However, the Supreme Court's language quoted by Gamble is not the holding of Price. After concluding that "circuit courts of appeals do have the power under § 262 of the Judicial Code to issue an order in the nature of a writ of habeas corpus commanding that a prisoner be brought to the courtroom to argue his own appeal," the Supreme Court made clear "that the power of a circuit court of appeals to issue such a writ is discretionary." Id. at 284, 68 S. Ct. 1059. The Supreme Court explained that "[t]he discretionary nature of the power in question grows out of the fact that a prisoner has no absolute right to argue his own appeal or even to be present at the proceedings in an appellate court." Id. at 285, 68 S. Ct. at 1060 (citing Schwab v. Berggren, 143 U.S. 442, 449, 12 S. Ct. 525, 527 (1892)). "Oral argument on appeal is not an essential ingredient of due process and it may be circumscribed as to prisoners where reasonable necessity so dictates." Id. at 286, 68 S. Ct. at 1060. Accordingly, Gamble failed to demonstrate that the Court of Appeals' denial of his request to appear for oral argument was contrary to or an unreasonable application of clearly established Federal law, as determined by the Supreme Court, and granting habeas corpus relief on this ground is not warranted.

(R&R (Dkt. No. 33) at 25-26)

In his objections to the R&R, Gamble contends that the Court of Appeals "never stated any reason nor any necessity for not allowing petitioner to participate in the oral argument," and he once again cites to Price. (Pet. Obj. (Dkt. No. 36) at 12-14) Because Gamble

merely repeats in his objection his original argument, citing to the same authority, this Court reviews Judge Fox's recommendation only for clear error.

In Price, the Supreme Court states that an incarcerated appellant "has no absolute right to argue his own appeal or even to be present at the proceedings in an appellate court," and that "[o]ral argument on appeal is not an essential ingredient of due process and it may be circumscribed as to prisoners where reasonable necessity so dictates." Price, 334 U.S. at 285-86. Price does not set out any requirement that a state appellate court must explain, on a case-by-case basis, its reasons for denying a pro se incarcerated appellant the opportunity to present oral argument. This Court therefore finds no error in Judge Fox's analysis, and Petitioner's objection is overruled.

**B.    Ineffective Assistance of Counsel**

Gamble further contends that he received ineffective assistance of counsel at trial, because his lawyer did not (1) object to a jury instruction concerning prior bad act evidence; and (2) pursue exculpatory information related to Marvin Ford's baseball bat attack on Gamble on the day of the murders. (Pet. (Dkt. No. 2) at 7)

**1.    Applicable Law**

The Supreme Court has established a two-part test for habeas petitions premised on ineffective assistance of counsel:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984).  A claim for habeas relief "must be rejected if the defendant fails to meet either the performance prong or the prejudice prong."  Bennett v. United States, 663 F.3d 71, 85 (2d Cir. 2011).

"A criminal defendant has a high burden to overcome to prove the deficiency of his counsel."  Lynn v. Bliden, 443 F.3d 238, 247 (2d Cir. 2006).  "Judicial scrutiny of counsel's performance must be highly deferential."  Strickland, 466 U.S. at 689.  Indeed, in performing the first prong of the Strickland analysis, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[,]" as "[t]here are countless ways to provide effective assistance in any given case."  Id.  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]"  Id. at 690.

Under the second prong of the Strickland test, a petitioner must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  In applying this standard, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.

### 2.    **Analysis**

#### a.    **Prior Bad Acts Instruction**

At trial, Cortina Watson testified about an April 13, 2002 incident in which Gamble threatened her and Ricky Younger and displayed the handle of a gun.  Marvin Ford testified about a January 18, 2003 incident in which Gamble threatened Ford, Eunice Younger, and Ricky Younger, and displayed a knife and a revolver.

The trial judge gave the jury the following instruction regarding this evidence:

16

> Now in this case although the defendant is charged only with the shootings of Eunice Younger, Ricky Younger and Gloria Watson you heard evidence about other incidents prior to the shootings. . . .
>
> You also heard testimony from the defendant in which he denied engaging in any of this conduct. While the defendant is not charged with his other conduct, the People contend that it provides necessary background to their case, that is, that it tends . . . to establish that the defendant had a motive for shooting Eunice Younger, Ricky Younger and Gloria Watson and that it tends, based on the prior conflict between them and the defendant to establish along with the other evidence in the case the defendant's identify as the person who shot them. I am instructing you that for these limited purposes and for these purposes only you may consider this evidence. . . .
>
> You may not . . . consider this evidence for any other purpose, and in particular you may not use it as evidence that the defendant possessed the propensity or disposition to engage in criminal conduct in general or to commit the crimes charged in particular.

(Trial Tr. at 1705-07)

Gamble's lawyer then asked the trial judge to also instruct the jury that the "April 13th and January 18th" incidents were "offered for the purpose of establishing motive and intent," and not "to establish [that Gamble] possessed a revolver on the 15th of March." (Id. at 1734-36) In response to defense counsel's request, the trial judge gave the jury the following supplemental instruction:

> I instructed you, in talking about the evidence of conduct before[] the conduct that the defendant is charged with in this case. It is the conduct about threats and other conduct involving the deceased and Mr. Ford. That I [ad]mitted it for a particular purpose, that is in connection with the People's argument that this evidence provided necessary background to their case. It is intended with other evidence in the case to establish that the defendant had a motive for shooting Eunice and Ricky Younger and Gloria Watson. And that it tends based on the prior conflict between them and the defendant to establish along with other evidence in the case the defendant's identity as the person who shot them. And I told you you could consider it for no other purpose. Among the purposes for which you may not consider it is evidence that the defendant possessed a gun, possessed a revolver, on March 15th of 2003.

(Id. at 1744-45)

Gamble contends that this supplemental instruction addresses only Marvin Ford's testimony about the January 18, 2003 incident, and not Cortina Watson's testimony about the April 13, 2002 incident, and that his lawyer was constitutionally ineffective in failing to object on this basis.  (Pet. (Dkt. No. 2) at 3-4)

Judge Fox rejects this argument, noting that

> [a]lthough the court in its supplemental jury instruction mentioned Ford by name, but not Cortina, it specifically instructed the jury that "the conduct about the threats" cannot be considered as evidence that Gamble possessed the gun on March 15, 2003.  Thus, the court's instruction included all evidence of threats, including Cortina's testimony.  Counsel's failure to object to the court's omission of Cortina's name in giving the supplemental instructions was reasonable, under the circumstances.  Gamble's contention that his attorney rendered ineffective assistance to him based on his assumption of "the likely improper use of [Cortina's] testimony" is not sufficient to satisfy his burden of showing that the state court's decision[] rejecting his ineffective assistance of counsel claim, based on counsel's failure to correct the court's supplemental instruction, was contrary to or an unreasonable application of <u>Strickland</u>.  Accordingly, habeas corpus relief is not warranted based on this ground.

(R&R (Dkt. No. 33) at 27-28) (brackets in original)

In objecting to the R&R, Gamble contends that the trial judge's supplemental instruction regarding "conduct about threats" was not a sufficiently specific reference to Cortina Watson's testimony about the April 13, 2002 incident.  (Pet. Obj. (Dkt. No. 36) at 10-13)[5]  Because Gamble merely repeats the argument he made in his petition, this Court reviews Judge Fox's findings only for clear error.

---

[5]  Petitioner also complains that Judge Fox should have considered "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction," citing <u>Chapman v. California</u>, 386 U.S. 18, 23 (1967).  (Pet. Obj. (Dkt. No. 36) at 12)  The <u>Chapman</u> harmless error standard does not apply to ineffective assistance of counsel claims brought in habeas petitions, however.  As discussed above, ineffective assistance claims made in habeas petitions are governed by the <u>Strickland</u> standard.

This Court concludes that the supplemental instruction's references to "evidence of conduct before[] the conduct that the defendant is charged with in this case," and "conduct about threats and other conduct involving the deceased and Mr. Ford," encompasses Cortina Watson's testimony about the April 13, 2002 incident.  (Trial Tr. at 1744)  The trial judge also explicitly instructed the jury that it could not consider Gamble's prior conduct "as evidence that the defendant possessed a gun, possessed a revolver, on March 15th of 2003."  (Id. at 1744-45)  In sum, it appears clear that defense counsel did not object to the trial judge's supplemental instruction because that instruction informed the jury that Gamble's prior conduct could be considered only as to motive, and not for any other purpose.  There was thus no error in the supplemental instruction, and defense counsel was not constitutionally ineffective in failing to object to it.  Accordingly, Petitioner's objection is overruled.

### b.    Alleged Failure to Request Exculpatory Evidence

Gamble also complains that his lawyer failed to obtain "a crime scene witness statement which exonerates [him] and disproves the prosecution's theory of the case."  (Pet. (Dkt. No. 2-1) at 5)  Gamble asserts that

> [t]he statement at issue is a witness interview which detailed a baseball bat attack committed by one of the deceased hours before the homicides.  The witness also stated that they were present at the location of the homicides and described the perpetrator as someone other than me.  The witness further stated that they knew the deceased.

(Id.)

The witness statement cited by Gamble was discussed at a January 7, 2004 pre-trial hearing.  In an August 7, 2009 brief that Petitioner filed with the First Department, he provides the following account of what took place at the January 7, 2004 hearing:[6]

_____

[6]  The parties have not provided a transcript of the January 7, 2004 pretrial hearing.  Rule 5(c) of the Rules Governing Section 2254 Cases states that "[if] a transcript [of a court proceeding]

Prior to trial Mr. Gamble's attorney made a specific request for documented information in which a witness known to the prosecution observed one of the deceased, Ricky Younger, wielding a baseball bat and chasing an unidentified person shortly before the time of the crimes alleged in the indictment. [January 7. 2004, P.2, L.23 to P.3, L.15] Mr. Gamble's attorney made the defense's position clear that the person being chased was "not my client". [January 7, 2004, P.4, L.9]. . . .

During this hearing the prosecutor, in stating[,] "I think it's in a DD5", informed the Court that there was a documented interview of the person who witnessed the baseball bat attack and that witness had positively identified Ricky Younger as the attacker. [January 7, 2004, P.9, L.11]. The defense needed this information and, as a result, the Court stated that this information would be relevant to Mr. Gamble's defense "if there was an incident where there was a witness who observed RY chasing somebody who was extraordinarily, clearly not the defendant". [January 7, 2004, P.9, L.19 to L.22]

Ultimately, the Court instructed the prosecutor to deliver the unredacted document, all related notes and a letter to the Court. The Court stated that the information would then be sealed and made "part of the record". [January 7, 2004, P.12, L.20 to P.13, L.18].

(Resp. Ex. 2a (Aug. 7, 2009 Gamble First Dept. Br.) (Dkt. No. 11-2) at 12-13) (bracketed

citations in original)

During a May 20, 2004 pre-trial hearing, the trial judge asked the prosecutor if

there was "anything outstanding" regarding "the paperwork asserting the earlier incident with the

bat." (May 20, 2004 Hrg. Tr. (Dkt. No. 87) at 4) The prosecutor stated:

There's no [outstanding] paperwork as far as I understand. We had, I guess, spoken yesterday about the DD5 and the copy of the notes which I actually do have a copy of the letter that I transmitted it to Judge Mogulescu with, but that both those items are in [defense counsel's] possession as well. . . . It's DD5 number one, for the record, as well as the notes in question.

---

cannot be obtained, the respondent may submit a narrative summary of the evidence." Citing Rule 5(c), Respondent relies on Petitioner's summary of what took place at the January 7, 2004 hearing, as set forth in the August 7, 2009 brief that Petitioner filed with the First Department. (Resp. Opp. (Dkt. No. 11) at 47-48)

(Id.) Defense counsel did not dispute the prosecutor's statement that she had been given the relevant DD5 and the associated notes.

Moreover, Petitioner attached the relevant DD5 and notes to a December 26, 2011 motion to supplement the record that he filed with the New York Court of Appeals.  (See Resp. Ex. 25 (Dec. 26, 2011 Pet. Pro Se Mot.) (Dkt. No. 11-31))  In his motion, Gamble states that "DD5 number one was disclosed by respondent pursuant to a Court Order of January 7, 2004 and made part of the record on appeal."  (Id. at 5)  Also attached to Gamble's motion is a March 15, 2003 DD5 prepared by Det. Edwin Mangual, the lead investigator for the shootings, in which he states that a witness – whose name is redacted – reported that "shortly after 4 PM" he saw a woman scream for help from the second story window of 1995 Birchall Avenue, and then "heard a gun shot."  (Id. at 7)  A "few seconds later," the witness saw "a male exit 1995 Birchall whom he recognized to be a resident at [that] location."  (Id.)  While this DD5 does not mention a baseball bat attack, Gamble also attached a page of handwritten notes that accompanied the DD5. Those notes state:  "saw him at about 1200" and "perp got hit with bat."  (Id. at 13))

Respondent asserts that this DD5 is the "DD5 number 1" cited by Gamble in the motion to supplement the record that he filed with the New York Court of Appeals.  (Resp. Opp. (Dkt. No. 11) at 6)  While these documents do not identify Ricky Younger as the baseball bat assailant, the content of these documents is otherwise consistent with the description of these documents provided by the prosecutor at the January 7, 2004 hearing.[7]

---

[7]  While (1) defense counsel asserted at the January 7, 2004 hearing that Ricky Younger had attacked someone other than Gamble; and (2) the judge commented that any such statement would be relevant to Gamble's defense, the prosecutor is not alleged to have said that a witness had reported that Ricky Younger attacked someone other than Gamble.  (Resp. Ex. 2a (Aug. 7, 2009 Gamble First Dept. Br.) (Dkt. No. 11-2) at 12-13)

Gamble, for his part, acknowledges that the prosecution "disclosed a DD5 to defense counsel," but complains that that DD5 "mentions absolutely nothing about a baseball bat attack." Gamble ignores the fact that the accompanying handwritten notes refer to the baseball bat attack. (Pet. Br. (Dkt. No. 2-1) at 5) In any event, Petitioner contends that the prosecutor possessed a DD5 that referenced the baseball bat attack but failed to disclose it, and that Petitioner's lawyer was constitutionally ineffective in failing to request this alleged DD5. (Id.; see also Pet Reply (Dkt. No. 28) at 28, 35)

Judge Fox rejects this argument in summary fashion, concluding that "[n]othing in the record indicates that counsel's failure to pursue allegedly 'exculpatory' evidence was not strategic or that her conduct fell below an objective standard of reasonableness." (R&R (Dkt. No. 33) at 28) Petitioner objects to this portion of the R&R in a similar summary fashion, repeating his original claim that his lawyer failed to request a DD5 that "exculpate[s]" him. (Pet. Obj. (Dkt. No. 36) at 6) This Court therefore reviews Judge Fox's finding for clear error.

As an initial matter, Gamble has not demonstrated the existence of exculpatory evidence that was not produced by the prosecution, much less that his lawyer failed to request it. At the May 20, 2004 pre-trial hearing, the prosecutor told the trial judge that he had provided a "DD5" and the associated "notes" about "the earlier incident with the bat" to defense counsel. (May 20, 2004 Hrg. Tr. (Dkt. No. 87) at 4) Defense counsel did not dispute the prosecutor's statement, indicating that she had, in fact, received these documents. And Gamble himself attached a DD5 and notes regarding the baseball bat attack to a brief he filed with the New York Court of Appeals. While the DD5 does not mention the baseball bat attack, the accompanying notes state, "saw him at about 1200" and "perp got hit with bat." (Resp. Ex. 25 (Dec. 26, 2011 Pet. Pro Se Mot.) (Dkt. No. 11-31) at 13) While these documents do not identify Ricky Younger

as the baseball bat assailant, they are otherwise entirely consistent with the description provided by the prosecutor at the January 7, 2004 pretrial hearing. And Gamble cites no other evidence suggesting that any other DD5 or any other notes exist concerning this incident. Accordingly, Gamble has not demonstrated that his lawyer was constitutionally ineffective in failing to request any such "exculpatory" material.

Gamble has also not demonstrated prejudice under Strickland. On the issue of whether it was Gamble who committed these murders, it matters little whether the baseball bat assailant was Marvin Ford or Ricky Younger. Ricky Younger was, of course, one of the murder victims, and a baseball bat attack on Gamble by either Ricky Younger or Ford would have given Petitioner a motive to commit the murders. Moreover, as discussed above, the prosecutor never stated at the January 7, 2004 hearing that a witness had identified someone other than Gamble as the victim of the baseball bat attack, and neither the DD5 nor the accompanying notes suggest that the victim of the baseball bat attack was someone other than Gamble. There is likewise no support for Gamble's claim that a witness had "stated that they were present at the location of the homicides and described the perpetrator as someone other than me." (Pet. (Dkt. No. 2-1) at 5)

There was also overwhelming evidence of Gamble's guilt at trial. As an initial matter, Gamble had repeatedly threatened to kill the victims with a gun that he displayed to them. At trial, three witnesses testified that they saw Gamble leave the victims' apartment building at about 4:00 p.m. on the day of the murders, only moments after gunshots had been fired. Two of these witnesses identified Gamble in a lineup the day after the murders. The police also recovered Gamble's fingerprint inside the victims' apartment, a piece of evidence for which Gamble had no explanation, given that he testified at trial that he had never entered the victims' apartment. (Trial Tr. at 1269) In sum, even if the police report cited by Gamble

23

existed, and even if defense counsel failed to request this alleged police report – assertions for which there is no corroborating evidence – there is no reason to believe that the outcome of Gamble's trial would have been different.

Accordingly, Petitioner's objection is overruled.

### C.    Missing Exculpatory Information in the Appellate Record

Gamble argues that the same alleged police report discussed above is "missing from the record on appeal." (Pet. Br. (Dkt. No. 2-1) at 7-8) While Gamble does not further explain the nature of his claim on this point, Judge Fox construes Gamble's claim as one brought under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. (R&R (Dkt. No. 33) at 28-32)

To establish a Brady violation, "'[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" United States v. Gil, 297 F.3d 93, 101 (2d Cir. 2002) (quoting Strickler v. Greene, 527 U.S. 263, 281–82 (1999)). "Evidence is favorable to the accused if it either tends to show that the accused is not guilty or impeaches a government witness." United States v. Jackson, 345 F.3d 59, 71 (2d Cir. 2003) (quoting Gil, 297 F.3d at 101) (internal quotation marks omitted); see also Giglio v. United States, 405 U.S. 150, 154 (1972). Prejudice is established when a petitioner can demonstrate that the evidence is "material." Lewis v. Connecticut Comm'r of Correction, 790 F.3d 109, 124 (2d Cir. 2015). "[E]vidence is 'material' within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Turner v. United States, 582 U.S. 313, 324 (2017) (quoting Cone v. Bell, 556 U.S. 449, 469–70 (2009)). A "reasonable probability" of a different result "is one in

which the suppressed evidence 'undermines confidence in the outcome of the trial.'" <u>Id.</u>
(quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995)).

Judge Fox concludes that (1) Gamble's <u>Brady</u> claim is "unexhausted for the purpose of federal habeas review," because it was not properly presented to the New York Court of Appeals; (2) Gamble has "failed to establish that the evidence at issue has been suppressed by the prosecutor"; and (3) Gamble has "failed to establish that, even if the evidence at issue had not been disclosed, it was material." (R&R (Dkt. No. 33) at 29-32) In his objections, Gamble argues that Judge Fox's findings reflect "error," but he does not explain why. (<u>See</u> Pet. Obj. (Dkt. No. 36) at 3-7) Accordingly, this Court reviews Judge Fox's findings only for clear error.

This Court agrees with Judge Fox that Gamble has not demonstrated that the prosecution suppressed exculpatory evidence, or that any such evidence – if disclosed – would have been material at trial. For the reasons discussed above in connection with Gamble's ineffective assistance of counsel claim, Gamble has not demonstrated the existence of exculpatory evidence that is "missing from the record on appeal." As discussed above, the transcript of the May 20, 2004 pretrial hearing indicates that defense counsel had received the DD5 and accompanying notes referenced by the prosecutor at the January 7, 2004 pretrial hearing. (May 20, 2004 Hrg. Tr. (Dkt. No. 87) at 4) And in Gamble's December 26, 2011 filing with the New York Court of Appeals, he attached that DD5 and the notes stating that "perp got hit with bat," which are consistent with the prosecutor's description of this evidence at the January 7, 2004 pretrial hearing. (Resp. Ex. 25 (Dec. 26, 2011 Pet. <u>Pro</u> <u>Se</u> Mot.) (Dkt. No. 11-31) at 13) Petitioner's filing with the Court of Appeals states that these documents were "made part of the record on appeal." (<u>Id.</u> at 5) Accordingly, he cannot now contend that they were not

part of the record on appeal. And to the extent that Gamble contends that some other DD5 exists – as discussed above – he has proffered no evidence for that claim.

As is also discussed above, even if the alleged DD5 cited by Gamble existed, there is no reasonable probability that the outcome of the trial would have been different, given the overwhelming evidence of Gamble's guilt.

Accordingly, Petitioner's objection is overruled.[8]

---

[8] Gamble also contends that certain "sealed documents" were "never provided to any appellate court." (Pet. Obj. (Dkt. No. 36) at 4) To the extent Gamble is referring to the witness statement about the baseball bat assailant, his objection is overruled for all of the reasons discussed above. To the extent Gamble is referring to some other alleged "sealed documents," there is no evidence that any such sealed documents exist. In a September 3, 2010 letter to Gamble, a Court Attorney with the Unified Court System, Twelfth Judicial District, states that "the Court sealed no documents in this matter," referring to the prosecution of Gamble in New York Supreme Court, Bronx County. (Resp. Ex. 12 (Sep. 3, 2010 Ltr.) (Dkt. No. 11-12) at 1) Accordingly, there is no evidence that any sealed documents exist in Petitioner's New York state proceedings, much less that any such sealed documents were not part of the record on appeal. Petitioner's objection on this basis is therefore overruled.

Gamble also complains that the R&R "fail[s] to comply with the procedures set forth in" 28 U.S.C. § 2254(f). (Pet. Obj. (Dkt. No. 36) at 4) That section provides:

> If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such determination. If the applicant, because of indigency or other reason is unable to produce such part of the record, then the State shall produce such part of the record and the Federal court shall direct the State to do so by order directed to an appropriate State official. If the State cannot provide such pertinent part of the record, then the court shall determine under the existing facts and circumstances what weight shall be given to the State court's factual determination.

28 U.S.C. § 2254(f).

Citing this provision, Gamble moves "for an order directing the state to produce the documents the hearing Judge ordered to be sealed and made part of the record," apparently referring to the January 7, 2004 hearing regarding the witness statement about the baseball bat attack. (Pet. Obj. (Dkt. No. 36) at 5) While the judge at the January 7, 2004 hearing directed the prosecutor to submit the DD5, the accompanying notes, "and a letter to the Court," and stated "that the information would then be sealed and made 'part of the record'" (Resp. Ex. 2a (Aug. 7, 2009

D.    **Alleged Admission of Hearsay Evidence**

Gamble argues that the trial judge erroneously admitted the testimony of prosecution witness Camilo Pombo.  Pombo – the general manager of News 12 – testified that on March 15, 2003, the News 12 evening broadcast at 5:00 p.m. and 5:30 p.m. was a rerun of the 1:00 p.m. newscast.  Pombo further testified that News 12 first broadcast news of the three murders in its 10:00 p.m. program on March 15, 2003.  (Trial Tr. at 1518-21)  Pombo's account contradicted Gamble's testimony that he learned about the murders from watching a News 12 broadcast at 5:00 p.m. or 5:30 p.m. that day.  (Id. at 1274-75)

Because Pombo did not recall any details about the News 12 broadcasts on March 15, 2003 (see id. at 1526), he testified as a document custodian witness.  After the prosecution showed Pombo News 12 records concerning the station's broadcasts on March 15, 2003, and asked him a series of foundation questions establishing the elements for the business records exception to the hearsay rule, the court admitted these records pursuant to New York's business records exception to the hearsay rule.  (Id. at 1516-18)  The News 12 records formed the basis for Pombo's testimony about the timing of the broadcasts.  (Id. at 1518-21)  Gamble contends that the trial judge erred in admitting this evidence, which he contends was hearsay.  (Pet. (Dkt. No. 2) at 10)

Judge Fox rejects Gamble's argument, finding that his complaint about the admission of alleged hearsay does not provide a basis for federal habeas corpus relief:

_____

Gamble First Dept. Br.) (Dkt. No. 11-2) at 12-13), there is no evidence that this sealed filing was ever made.  The prosecutor instead provided the DD5 and the accompanying notes directly to defense counsel and "Judge Mogulescu," and stated as much at the May 20, 2004 pretrial hearing.  (See May 20, 2004 Hrg. Tr. (Dkt. No. 87) at 4)  In sum, there is no evidence that the sealed filing cited by Gamble was ever made.  Accordingly, his motion pursuant to Section 2254(f) is denied.  To the extent that Petitioner characterizes this argument as an objection to the R&R, his objection is overruled on the same basis.

Whether evidence is "incorrectly admitted . . . is no part of a federal court's habeas review of a state conviction," because "federal habeas corpus relief does not lie for errors of state law." Estelle v. McGuire, 502 U.S. 62, 67, 112 S. Ct. 475, 480 (1991) (citation omitted). In conducting federal habeas review, a court is limited to deciding "whether the admission [or omission] of the evidence violated [the petitioner's] federal constitutional rights." Id. at 68, 112 S. Ct. at 480. Thus, federal habeas relief may be warranted only where the evidentiary ruling "so infused the trial with unfairness as to deny due process of law." Id. at 75, 112 S. Ct. at 484 (quoting Lisenba v. California, 314 U.S. 219, 228, 62 S. Ct. 280, 286 (1941)).

To the extent that Gamble claims that the rebuttal evidence, namely, "Pombo's testimony about what aired between 5 p.m. and 5:30 p.m.," based on the "newslogs for the 6:00 p.m. and 10:00 p.m. news casts [sic]," was admitted improperly under the state evidentiary rules, that claim alone is not sufficient to form a basis for federal habeas corpus review. Moreover, Bourjaily[ v. United States, 483 U.S. 171 (1987)] does not govern Gamble's claim because that case involved "Federal Rule of Evidence 801(d)(2)(E)," providing that "[a] statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy," and the following issues:

> (1) whether the court must determine by independent evidence that the conspiracy existed and that the defendant and the declarant were members of this conspiracy; (2) the quantum of proof on which such determinations must be based; and (3) whether a court must in each case examine the circumstances of such a statement to determine its reliability.

Bourjaily, 483 U.S. at 173, 107 S. Ct. at 2777-78 (quoting Fed. R. Evid. 801(d)(2)(E)). Gamble's claim involves a state-law-evidentiary rule that does not deal with a statement by a coconspirator. In light of the entire trial record, Gamble failed to show that any impropriety in admitting the rebuttal evidence so infused the trial with unfairness that it denied him due process of law. Therefore, his erroneous evidentiary ruling claim does not provide a basis for habeas corpus relief.

(R&R (Dkt. No. 33) at 32-33)

Petitioner does not object to Judge Fox's reasoning. He instead contends – for the first time – that the admission of the News 12 business records violated the Sixth Amendment's Confrontation Clause. (Pet. Obj. (Dkt. No. 36) at 6-9)

As an initial matter, Petitioner never raised a Confrontation Clause objection to Pombo's testimony during his state court proceedings. Gamble filed a pro se brief with the New

York Court of Appeals in which he argued that his lawyer's failure to object to Pombo's testimony constituted ineffective assistance of counsel, but the basis for Gamble's objection was only that the evidence constituted "incompetent, unreliable, inadmissible hearsay" that had "no basis in fact." (Resp. Ex. 9 (Jan. 25, 2011 Gamble Pro Se Suppl. Br.) (Dkt. No. 11-14) at 20) Petitioner did not reference the Confrontation Clause. Thus, even if this Court found – as Judge Fox did with respect to Petitioner's hearsay objection to Pombo's testimony – that "the claim may be deemed exhausted, since raising it in the state court at this juncture would be futile" (R&R (Dkt. No. 33) at 32) (citing Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001); N.Y. C.P.L. § 440.10(2)(c)), any such claim would still be "procedurally defaulted," because Petitioner "failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" Aparicio, 269 F.3d at 90 (quoting Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991)).

Moreover, even if this Court were to consider Gamble's Confrontation Clause argument on the merits, there is no basis to find that the News 12 business records admitted at trial constitute "testimonial hearsay" under Crawford v. Washington, 541 U.S. 36, 68 (2004),[9] such that their admission violated the Confrontation Clause. Crawford provides that "testimonial" evidence includes "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations." Id. The News 12 business records admitted at Gamble's trial were, however, created in the regular course of News 12's business (see Trial Tr. at 1516-18), and were not the product of law enforcement's investigation of the March 15, 2003

---

[9] Crawford was decided on March 8, 2004. Petitioner's trial took place in September and October 2004.

murders.  And <u>Crawford</u> acknowledges that "business records" are "by their nature . . . not

testimonial."  <u>Crawford</u>, 541 U.S. at 56.  In sum, the News 12 business records admitted at

Gamble's trial are not "testimonial" under <u>Crawford</u>.  Accordingly, Petitioner's objection is

overruled.

*     *     *     *

The Court has reviewed the remainder of the R&R and finds it to be thorough,

well-reasoned, and free of any clear error.  Accordingly, Judge Fox's R&R will be adopted.[10]

## III.    <u>MOTIONS TO AMEND AND FOR APPOINTMENT OF COUNSEL</u>

While this matter was stayed between 2020 and 2024, Petitioner moved to amend

his habeas petition (Dkt. Nos. 61, 63, 64, 67, 68, 71, 73, 74), and for appointment of counsel.

(Dkt. Nos. 64, 67, 68, 71, 73, 74)

This Court will refer these motions to Magistrate Judge Jennifer Willis for an

R&R.  Accordingly, while this Court adopts Judge Fox's R&R, the case will remain open

pending the resolution of Petitioner's motions to amend and for the appointment of counsel.

---

[10]  Petitioner also objects to the R&R on the grounds that "the record used during the review conducted for the report and recommendation . . . fail[ed] to contain all trial transcripts, all relevant exhibits, all pretrial decisions, and all sealed documents," and therefore "violates [Petitioner's] constitutional right to due process of law."  (Pet. Obj. (Dkt. No. 36) at 2)  Petitioner cites no Supreme Court authority for this proposition, nor does he cite any violation of the Rules Governing Section 2254 Cases, which control the content of the evidentiary record for habeas petitions brought in federal district courts.  Petitioner's objection is therefore overruled.

Petitioner also contends that the absence of these records violates Federal Rule of Evidence 302 and New York C.P.L.R. § 5525.  Rule 302 provides that "[i]n a civil case, state law governs the effect of a presumption regarding a claim or defense for which state law supplies the rule of decision."  Fed. R. Evid. 302.  New York C.P.L.R. § 5525 sets forth rules regarding the preparation of transcripts in New York state court appellate proceedings.  Petitioner does not explain how either of these statutes would entitle him to federal habeas relief.  Accordingly, to the extent Petitioner's objections are premised on these statutes, they are overruled.

## CONCLUSION

For the reasons stated above, Judge Fox's R&R is adopted, and the petition is denied. The Clerk of Court is directed to mail a copy of this order to pro se Petitioner Corey Gamble.

Dated:  New York, New York
      August 29, 2024

SO ORDERED.

Paul G. Gardephe
United States District Judge